UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. 2:14-CR-618-01 |
| | § | |
| SEVERO CANALES-ROSALES | § | |

## ORDER

On August 27, 2014, a grand jury charged Defendant Severo Canales-Rosales with two counts of transporting aliens in violation of 8 U.S.C. § 1324.  Dkt. No. 14. Now before the Court is Defendant's Motion to Suppress Evidence (Dkt. No. 20), wherein he seeks to suppress any evidence of the roving stop that led to the discovery of aliens in the vehicle he was driving immediately prior to his arrest. The Court heard evidence and argument pertaining to Defendant's Motion at a hearing held on October 22, 2014.

After considering the relevant legal authority along with the evidence and argument received in this case, the Court finds that the agents who conducted the roving stop, though well intentioned, lacked reasonable suspicion to believe that criminal activity was afoot.  The stop therefore violated Defendant's right to be free from unreasonable seizures under the Fourth Amendment, and Defendant's Motion to Suppress Evidence (Dkt. No. 20) is **GRANTED**.

## I.    FACTS

On August 10, 2014, Border Patrol Agent Donald Kenefick was patrolling a stretch of Highway 77 just south of Robstown, Texas.[1]   Agent Kenefick was partnered with his passenger, Border Patrol Agent John Corona, while they worked the midnight-to-ten-a.m. shift.  Agent Kenefick had been a Border Patrol Agent for almost eleven years and Agent Corona had been a Border Patrol Agent for a little more than a year.

At about 2:30 a.m., Agents Kenefick and Corona encountered a white Chevrolet Suburban traveling northbound on Highway 77.  The agents noticed that the rear of the vehicle appeared heavily laden, so they began to follow the Suburban from a distance of a couple hundred yards.  Although the Suburban was initially traveling at about seventy-five miles per hour, the posted speed limit, it slowed down to about fifty-five miles per hour as the agents began following more closely. The agents tried to look inside the vehicle, but its tinted windows prevented them from ascertaining the number of occupants or appearance of any occupants inside.

Agent Corona then requested a registration check and a crossing check on the Suburban.   The registration check revealed that it was registered out of Brownsville, Texas.  The crossing check revealed that it had passed through the Border Patrol checkpoint in Sarita, Texas, a little more than twenty-four hours prior.  This fact was significant in the agents' minds because the checkpoint in Sarita is only about fifty miles south of Robstown.   The agents believed that traveling such a short distance in a twenty-four-hour period was consistent with a

---

[1] Traveling on Highway 77, Robstown is about 150 miles north of the Texas-Mexico border.

common circumvention technique where aliens exit a vehicle before the checkpoint, travel around the checkpoint on foot, and then reunite with the vehicle past the checkpoint.

The agents initiated a stop about five minutes after they began following the Suburban. Agent Kenefick approached the vehicle and eventually convinced the occupants to open the windows so he could see inside. Agent Kenefick saw seven individuals: Defendant, who was driving, a passenger in the front seat, three individuals sitting in the back seat, one individual on the floor below the back seat, and one individual in the rear cargo area. Agent Kenefick determined that none of the individuals were legally present in the United States.

## II. LEGAL STANDARD

The Fourth Amendment protects the right of the people to be secure in their persons against unreasonable seizures, and the court-fashioned exclusionary rule requires "suppressing evidence obtained in violation of this command." *Davis v. United States*, __ U.S. __, 131 S. Ct. 2419, 2426 (2011). A Border Patrol agent does not unreasonably seize an individual when he conducts a roving stop if the stop "is supported by reasonable suspicion to believe that criminal activity may be afoot." *United States v. Galvan-Torres*, 350 F.3d 456, 457 (5th Cir. 2003) (quoting *United States v. Arvizu*, 534 U.S. 266 (2002)). Conversely, when a Border Patrol agent conducts a roving stop without reasonable suspicion, the stop constitutes an unreasonable seizure. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 882 (1975).

Whether a Border Patrol agent has reasonable suspicion to believe that a vehicle is involved in illegal activity depends on the totality of the circumstances. *United States v. Hernandez*, 477 F.3d 210, 213 (5th Cir. 2007). Factors that a court considers in assessing reasonable suspicion include:

> (1) the characteristics of the area in which the vehicle is encountered; (2) the arresting agent's previous experience with criminal activity; (3) the area's proximity to the border; (4) the usual traffic patterns on the road; (5) information about recent illegal trafficking in aliens or narcotics in the area; (6) the appearance of the vehicle; (7) the driver's behavior; and, (8) the passengers' number, appearance, and behavior.

*Id.* (citing *Brignoni-Ponce*, 422 U.S. at 885).

## III. ANALYSIS

The Government argues that the stop in this case was supported by reasonable suspicion based on (1) Highway 77's reputation as an alien-smuggling route, (2) the Suburban's tinted windows and heavily laden rear, (3) the driver's behavior in slowing down as the agents began to follow, and (4) the agents' experience indicating that Suburbans are common alien-smuggling vehicles and that the crossing check result was consistent with aliens evading the Sarita checkpoint. Defendant counters by addressing some of these individual points and emphasizes that the stop in this case was far from the border.

### A. Individual Factors

#### i. Proximity to the Border

The Fifth Circuit has "at times focused [its] inquiry initially on the question of whether arresting agents could reasonably conclude a particular vehicle originated its journey at the border." *United States v. Cardona*, 955 F.2d 976, 980

(5th Cir. 1992). "Proximity to the border is a paramount factor, and a car traveling more than fifty miles from the border is usually viewed as being too far from the border to support an inference that it originated its journey there." *United States v. Olivares-Pacheco*, 633 F.3d 399, 402 (5th Cir. 2011). If the Government does not point to facts supporting an inference that the vehicle came from the border, "the remaining factors must be examined charily." *Id.*

In this case, Agents Kenefick and Corona stopped Defendant's vehicle about 150 miles north of the border. The Government has not pointed to any fact supporting an inference that the vehicle originated its journey there. Thus, this factor does not support reasonable suspicion; quite the opposite, it mandates that the Court view the rest of the factors more carefully.

### ii. The Characteristics of the Area

The Government asserts in its response that Highway 77 is a known alien-smuggling route. Agent Kenefick testified that other agents in his station frequently apprehend smuggled aliens in motor vehicles within the area that they cover, though he had only personally apprehended aliens on a few occasions. The Court accepts the Government's contention and finds that the area where the stop occurred is a common alien-smuggling route, which counts in favor of reasonable suspicion in this case.

### iii. The Vehicle's Appearance

Next, the Government argues that the vehicle's appearance supported reasonable suspicion because the Suburban's rear appeared heavily laden and its

windows were tinted. The Fifth Circuit has indicated that a heavily laden appearance "alone is entitled to little weight, [but] it is a permissible factor for evaluation by the district court." *See Cardona*, 955 F.2d at 981. Similarly, tinted windows "alone do not rise to the level of reasonable suspicion," but they may contribute to reasonable suspicion by preventing agents from allaying other suspicions they may have. *United States v. Rivera-Gonzalez*, 413 F. App'x 736, 739 (5th Cir. 2011).

The Suburban's appearance in this case does add to Agent Kenefick's and Agent Corona's reasonable suspicion, but only slightly. Although they credibly testified that the rear of the Suburban appeared heavily laden, that fact, strangely enough, may be less suspicious given that the Suburban's windows were tinted. In *Cardona*, the Fifth Circuit noted that a vehicle's heavily laden appearance added to reasonable suspicion when "[t]estimony revealed the vehicle was riding considerably low to the ground, *despite the fact that it was visibly occupied by only two persons.*" *See Cardona*, 955 F.2d at 981 (emphasis added). Of course, a heavily laden appearance is suspicious with only two visible occupants because it may indicate that there are other persons in the vehicle hiding from view.

In this case, though, Agent Kenefick testified that he could not see inside the Suburban when he pulled next to it. Furthermore, he testified that once he stopped Defendant and saw inside the Suburban, he saw that there were three rows of seats: the driver and passenger seats in the first row, some more seats in the second row, and three seats in the third row. He also testified that he found seven

individuals in the vehicle. Given that he could not see inside the Suburban before he stopped it, this case is not like *Cardona* where the heavily laden appearance was inconsistent with the number of visible occupants. The appearance of significant weight in the vehicle from seven individuals is perfectly consistent with the fact that Suburbans are large vehicles that are equipped to hold seven or eight individuals.

However, Agent Kenefick also testified that it was specifically the rear end of the Suburban that appeared heavily laden. This is consistent with his testimony that he saw nobody seated in the middle row of seats, three individuals seated in the third row, one individual lying on the floor below the third row, and one individual in the rear cargo area. Although the absolute weight of seven individuals in the Suburban may not have been suspicious, the distribution of weight may have been. The weight of five individuals in the rear when the vehicle is only equipped to hold three in the rear counts in favor of reasonable suspicion if one assumes that an agent can distinguish between the appearances of each. The Court will give the agents the benefit of the doubt in this case,[2] and it finds that the Suburban's appearance slightly counts in favor of reasonable suspicion.

---

[2] The Court heard from Department of Homeland Security Special Agent Anne McGee, who testified that she conducted a demonstration with the Suburban once it was impounded. She had seven agents (notably, agents whose total weight exceeded the total weight of the seven individuals found in the Suburban by about 100 pounds) reenact the aliens' positions within the Suburban. She took a photo of the Suburban without any occupants and then took a photo of the Suburban with all seven occupants. She did not, however, take a photo of the Suburban with three occupants in the rear seats without any occupants on the floor below and in the rear cargo area. Such a photo would have been useful in determining how much of a difference, if any, those two extra individuals made with regard to the Suburban's appearance.

### iv. The Driver's Behavior

The Government also argues that Defendant's behavior in slowing down as Agents Kenefick and Corona began following him supports reasonable suspicion. "Although deceleration in the presence of a patrol car may be completely innocent behavior, . . . such behavior may be suspicious if the driver was not speeding when first observed." *United States v. Jacquinot*, 258 F.3d 423, 429 (5th Cir. 2001).

Agent Kenefick testified that Defendant was initially traveling at about the posted speed limit, seventy-five miles per hour, but he slowed down by about twenty miles per hour as Agent Kenefick began following him more closely. Such behavior would ordinarily be suspicious. However, Agent Kenefick also testified that the speed limit changes to fifty-five miles per hour once a driver enters Robstown. When he caught up with Defendant, he was "just south" of that point. Given this change in speed limit from seventy-five miles per hour to fifty-five miles per hour, Defendant's deceleration from seventy-five miles per hour to fifty-five miles per hour was not suspicious at all.

### v. The Agents' Experience

Finally, the Government argues that the agents' experience regarding the type of vehicle Defendant was driving and their experience regarding checkpoint-circumvention techniques supported their reasonable suspicion. Agents Kenefick and Corona testified that Suburbans and other large sport utility vehicles are commonly used when smuggling aliens. Agent Kenefick also testified that the crossing check's indication that the Suburban had only traveled fifty miles past the

Sarita checkpoint in more than twenty-four hours was consistent, in his experience, with aliens circumventing the checkpoint and reuniting with the Suburban.

The Court accepts the Government's first contention that the agents' experience with Suburbans and other large sport utility vehicles does count in favor of reasonable suspicion. Its weight, however, is minimal. The stop in this case occurred in South Texas, an area where many law-abiding individuals prefer to drive larger vehicles.

Regarding the crossing check, the Court also accepts the Government's contention that it counts in favor of reasonable suspicion. But again, its weight is minimal. The fact that the Suburban had only traveled fifty miles north of the Sarita checkpoint in more than twenty-four hours would have been quite suspicious if the area between Sarita and Robstown were a wasteland. But as Defendant points out, in between Sarita and Robstown, Highway 77 runs through Kingsville. Kingsville has a population of more than 25,000. That town is also home to a large university: Texas A&M – Kingsville. The result from the crossing check was just as consistent with the Suburban stopping off in Kingsville for a night as it was with the Suburban smuggling aliens around the Sarita checkpoint. Thus, the agents' experience with criminal activity counts only slightly in favor of reasonable suspicion in this case.

## B. The Totality of the Circumstances

Of course, reasonable suspicion is not examined using a "divide-and-conquer" analysis where a court weighs each individual factor in isolation. *See Arvizu*, 534

U.S. at 274. A court must "weigh not [the] individual layers but the laminated total" when determining whether a stop was supported by reasonable suspicion. *United States v. Zapata-Ibarra*, 212 F.3d 877, 881 (5th Cir. 2000).

The laminated total of potentially suspicious facts in this case seems to be the following: Agents Kenefick and Corona encountered a vehicle commonly used for alien smuggling with tinted windows and a heavily laden rear that was traveling on a route commonly used for alien smuggling and that had traveled only fifty miles north of the Sarita checkpoint in the last twenty-four hours. Two cases, one from the Fifth Circuit and one from a district court within the Fifth Circuit, are particularly helpful when assessing the totality of the circumstances in this case.

In *United States v. Guerrero-Barajas*, 240 F.3d 428 (5th Cir. 2001), the Fifth Circuit assessed a Border Patrol stop (1) that occurred thirty-five miles from the border, (2) where the vehicle had tinted windows and appeared heavily laden, (3) where the vehicle was traveling on a route frequented by alien smugglers, and (4) where the driver "slowed and began to swerve within his lane once the Agents began to follow him." *Id.* at 433. The court held that the stop was supported by reasonable suspicion. *Id.*

Although similar in some respects, the facts before the Court differ from *Guerrero-Barajas* in one key way: the stop here was not in close proximity to the border. As stated above, the Fifth Circuit has described proximity to the border as a "paramount factor." *See Olivares-Pacheco*, 633 F.3d at 402. Instead, the Court finds more analogous the facts presented in *United States v. Morales-Rosales*, 698 F.

Supp. 2d 716 (E.D. Tex. 2010). In that case, Judge Folsom assessed a Border Patrol stop (1) that occurred farther than fifty miles from the border, (2) where the vehicle had tinted windows and appeared heavily laden, (3) where the vehicle was traveling on a route frequented by alien smugglers, (4) where the vehicle was of a kind commonly used by alien smugglers, and (5) where the driver appeared "rigid and stiff." *Id.* at 721–22. Judge Folsom adopted the magistrate judge's report and recommendation and found that the stop was not supported by reasonable suspicion. *Id.* at 718.

*Morales-Rosales* sensibly found that when close proximity to the border is absent, the facts presented in that case, quite similar to the ones presented in this case, do not support a finding of reasonable suspicion. Here, Agents Kenefick and Corona encountered a vehicle that, although common to alien smuggling, is popular in the area. The vehicle appeared heavily laden in the rear, though they were not able to see inside to determine whether this was inconsistent with the number of visible occupants. The vehicle had also traveled only fifty miles north of the Sarita checkpoint in about twenty-four hours, though this is just as consistent with spending the night in Kingsville as it is with smuggling aliens around the checkpoint. Had the agents encountered Defendant's vehicle closer to the border or made other observations regarding the occupants in the vehicle, perhaps they would have had reasonable suspicion. But on the facts presented, the Court finds that the totality of the circumstances do not give rise to reasonable suspicion that criminal activity was occurring.

**IV.  CONCLUSION**

For the reasons stated above, the Court finds that the stop leading to the discovery of aliens in Defendant's vehicle was an unreasonable seizure under the Fourth Amendment.  Accordingly, his Motion to Suppress (Dkt. No. 20) is **GRANTED**, and the Court **SUPPRESSES** any evidence resulting from the stop.

It is so **ORDERED**.

**SIGNED** this 13th day of November, 2014.

Marina Garcia Marmolejo
United States District Judge